AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   20MJ2365
)
Black IPhone )
2020565500049502 and Item #1 )
(Target Device #2) )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code § 1324 | Transport Illegal Aliens(a)(1)(A)(ii) and (v)(II) |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Matthew R. Kucewicz, incorporated herein by reference.

☒ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Matthew Kucewicz, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date:   June 17, 2020

*Judge's signature*

City and state:   San Diego, California   Hon. Daniel E. Butcher, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Matthew Kucewicz, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

>   Blue Samsung
>   FP&F No. 2020565500049501 Item 03
>   ("**Target Device#1**")
>
>   Black iPhone
>   FP&F No. 2020565500049502 Item 01
>   ("**Target Device #2**")
>
>   Black iPhone
>   FP&F No. 2020565500049501 Item 04
>   ("**Target Device#3**")

the ("**Target Device(s)**"), as further described in Attachment(s) A-1, A-2, and A-3, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrant(s) relate(s) to the investigation and prosecution of Vanessa BARRERA and Orlando ESPINOZA for transportation of illegal aliens within the United States. The **Target Device(s)** is/are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

1

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2008, and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for twelve years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the

United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include

locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11.    On June 5, 2020, Border Patrol Agent M. Santos was conducting assigned duties in the Campo Border Patrol Station's area of responsibility. Agent Santos was dressed in plain clothes with his service badge displayed around his neck. At approximately 2:01 PM, Border Patrol Agent D. Beresiwsky received an alert, via government email, that a White Ford Escape bearing a California license plate was

recorded by a License Plate Reader (LPR) traveling west on Interstate 8 near the San Diego/Imperial County line. At approximately 2:05 PM, Agent Beresiwsky notified the Campo Border Patrol Station's Tactical Operations Center of the Ford's description, location, and direction of travel.

12. At approximately 2:20 PM, Agent Santos observed a White Ford Escape driving west on Interstate 8 east of Kitchen Creek Road. As the Ford passed his position, Agent Santos noticed that there were approximately four individuals riding inside. Agent Santos proceeded to follow the Ford and noticed that it switched lanes and reduced it's speed to a rate slower than the other motoring traffic. At approximately 2:22 PM, Border Patrol Agent R. Radcliff requested for a marked uniform agent to assist Agent Santos in performing a vehicle stop on the Ford. Supervisory Border Patrol Agent M. Lopez responded to the area and requested record checks on the Ford's California license plate. The record checks revealed that the Ford was a rental with three recent crossings through the Interstate 8 Campo Border Patrol Checkpoint. Agent Lopez activated his emergency lights in an attempt to stop the Ford. Agent Lopez noticed that the Ford began accelerating up to speeds of approximately 100 miles per hour. As the Ford was approaching the Checkpoint, agents attempted to immobilize it with a Vehicle Immobilization Device (VID) but failed to do so. At approximately 2:27 PM, Agent Lopez requested to attempt a box maneuver on the Ford with other agents. After a brief pursuit, Agents were able to successfully preform a box maneuver and safely stop the Ford. This area is located approximately 19 miles north of the United States/Mexico International Boundary and approximately 8 miles west of the Tecate, California Port of Entry.

13. Agent Lopez and Agent Santos approached the vehicle and ordered the driver, later identified as defendant Vanessa BARRERA, to unlock the doors and exit the Ford. BARRERA did not comply and was extracted from the Ford. After securing all of the individuals, Agent Santos approached the two rear passengers, identified himself as a

Border Patrol Agent, and conducted an immigration inspection. Both individuals, later identified as material witnesses Francisco CRUZ-Ledezma and Alberto LOPEZ-Felipe, stated that they are citizens of Mexico without proper immigration documents which would allow them to enter or remain in the United States legally. Agent Santos then conducted an immigration inspection on BARRERA and the front seat passenger, later identified as defendant Orlando ESPINOZA. BARRERA and ESPINOZA stated that they were United States Citizens. At approximately 2:45 PM, Agent Santos placed all four individuals under arrest.

14. Two black iPhone's and a Blue Samsung cell phone ("**Target Devices**") were discovered in the vehicle. A black iPhone was found on the driver's seat, another black iPhone was found on the passenger seat, and a blue Samsung cell phone was found in the center console cup holder. All three cell phones ("**Target Devices**") were subsequently seized. BARRERA claimed ownership of the iPhone on the driver's seat and the Samsung in the center console cup holder. ESPINOZA claimed ownership of the iPhone on the passenger seat.

15. Defendant Vanessa BARRERA was given her Miranda Rights at approximately 3:45 PM in the field. At approximately 11:03 PM, Agent Santos re-advised BARRERA of her Miranda Rights and she provided the following statement. BARRERA stated that she resides in Pomona, California. BARRERA stated that she was arrested for alien smuggling a few weeks ago in Indio, California. BARRERA stated that she and her friend Orlando ESPINOZA borrowed the load vehicle from a friend named "Anthony." BARRERA stated that she and ESPINOZA drove down to El Centro, California and rented a hotel room. BARRERA stated that she saw ESPINOZA talking with an unknown individual in a white Honda Civic that dropped off two individuals. The two individuals then got into her vehicle. BARRERA stated that ESPINOZA told her that they were taking the two individuals to Los Angeles, California. BARRERA stated that she thinks

7

ESPINOZA was to be paid $200 to transport the two individuals. BARRERA stated that when the Border Patrol attempted to pull her over, she wanted to stop but Material Witness CRUZ threatened to kill her if she stopped. BARRERA stated that CRUZ was choking her from the backseat. BARRERA stated that CRUZ repeatedly threatened her throughout the pursuit. BARRERA stated that she continued driving recklessly because she feared for her life.

16. Material Witnesses Francisco CRUZ-Ledezma and Alberto LOPEZ-Felipe admitted to being citizens of Mexico illegally present in the United States. Material Witnesses CRUZ and LOPEZ agreed to pay between $5,500 and $10,000 USD to be smuggled into the United States. When presented with a photographic lineup, CRUZ was able to positively identify Vanessa BARRERA as the driver of the vehicle and Orlando ESPINOZA as the passenger. LOPEZ was not able to identify the driver or the passenger in the vehicle.

17. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the Target Devices. In light of the above facts and my experience and training, there is probable cause to believe that the Defendants were using the Target Devices to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendants, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the Target Devices for data beginning on May 5, 2020, through June 5, 2020.

## METHODOLOGY

17. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

18. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

19. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days from the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

20. Law enforcement has previously attempted to obtain the evidence sought by this warrant through the owners' consent, but consent was not given.

## CONCLUSION

21. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device(s)** will yield evidence of BARRERA's and ESPINOZA's alien smuggling violation of Title 8, United States Code, Sections 1324.

22. Because the **Target Device(s)** were seized at the time of BARRERA's and ESPINOZA's arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device(s)**. As stated above, I believe that the appropriate date range for this search is from **May 5, 2020, through June 5, 2020**.

23. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item(s) described in Attachment A-1 and A-2, and A-3 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Matthew R. Kucewicz
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 8th day of June, 2020.

_____
Hon. Daniel E. Butcher
United States Magistrate Judge

11

# ATTACHMENT A-2

## PROPERTY TO BE SEARCHED

The following property is to be searched:

Black iPhone
FP&F No. 2020565500049502 Item 01
(**"Target Device #2"**)

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular telephone(s) described in Attachments A-1, A-2, and A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone(s) for evidence described below. The seizure and search of the cellular telephone(s) shall follow the search methodology described in the affidavit submitted in support of the warrant(s).

The evidence to be seized from the cellular telephone(s) will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of May 5, 2020 to June 5, 2020:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.